IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TREVOR L. WHYTE, | ) | |
| | ) | |
| Plaintiff, | ) | 2:19-CV-1092-NR |
| | ) | |
| v. | ) | |
| | ) | |
| STANLEY BLACK & DECKER, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**J. Nicholas Ranjan, United States District Judge**

Plaintiff Trevor Whyte brings four claims against Defendant Stanley Black & Decker: strict liability, negligence, breach of implied warranty, and breach of express warranty. Following discovery, Black & Decker now moves to exclude portions of Mr. Whyte's expert's testimony. ECF 38. Black & Decker also moves for summary judgment on all four of Mr. Whyte's claims. ECF 35. After carefully considering the parties' submissions, the Court will: (1) grant Black & Decker's motion to exclude portions of Mr. Whyte's expert's testimony; (2) deny Black & Decker's motion for summary judgment on Counts I-III; and (3) grant Black & Decker's motion for summary judgment on Count IV.

## BACKGROUND

Considering the evidence in Mr. Whyte's favor (as the non-movant), the facts relevant to the pending motions are as follows. Mr. Whyte began working at Superior Tire & Rubber in August 2017. ECF 37-1, p. 29.[1] There, he worked in the 150 wheel weld shop, where industrial wheel components were welded and stamped together. *Id.* at pp. 29-31. When he began working at Superior, Mr. Whyte received orientation

---

[1] Unless otherwise noted, all citations to the record refer to the page number of the ECF filing stamp on the top of each page (rather than the native page number).

training that involved observation and job shadowing.  *Id.* at pp. 31-33.  During his orientation, Mr. Whyte was trained to physically stamp digits (*e.g.*, a date code and product code) onto steel wheel plates by hitting a ball-peen hammer against a stamper/stamping die (with the stamping die pressed against the wheel plate being stamped).  *Id.* at pp. 34-36, 58-59, 111-12.

On February 2, 2018, Mr. Whyte was using a ball-peen hammer—manufactured by Black & Decker—to stamp digits onto wheel plates, as he was trained.  *Id.* at pp. 95, 111-12, 142.  During his shift, as Mr. Whyte hit the ball-peen hammer against the stamping die, a piece of the hammer chipped and pierced his abdomen.  *Id.* at pp. 114-16.  After an ambulance drove Mr. Whyte to a hospital, X-rays revealed a piece of the hammer lodged in his abdomen, which required an emergency surgery.  *Id.* at pp. 117, 119.

As a result of his injuries, Mr. Whyte filed this lawsuit against Black & Decker. In his amended complaint, Mr. Whyte brings four claims arising from the hammer's alleged manufacturing defects, design defects, and warning defects: strict liability (Count I), negligence (Count II), breach of implied warranty (Count III), and breach of express warranty (Count IV).  ECF 18.

Both Mr. Whyte and Black & Decker retained experts for this case.  ECF 31; ECF 32.  One of Mr. Whyte's experts, Joseph Turek, participated in a "destructive examination of the subject hammer to determine the cause of failure."  ECF 37-10, p. 4.  Through this examination, Mr. Turek—along with Black & Decker's expert, Joseph Gashinski—conducted a materials analysis of both the subject hammer and the stamp die against which Mr. Whyte struck the hammer when he was injured. *E.g.*, ECF 37-10, p. 6; ECF 37-13.  Mr. Turek concluded that the hammer's head was "mushrooming," *i.e.*, deforming.  *E.g.*, ECF 37-10, p. 7.  Black & Decker's expert, Mr. Gashinski, reached the same conclusion.  *E.g.*, ECF 37-13, p. 10.  Both experts also agreed that this "mushrooming" led to, or caused, the hammer to crack or chip.  *E.g.*,

ECF 37-10, p. 7; ECF 37-13, pp. 26, 32.  Additionally, both experts agreed that the stamping die was harder than the hammer, and that this hardness differentiation led to, or caused, the hammer to crack or chip.  *E.g.*, ECF 37-10, pp. 9-10; ECF 37-13, pp. 31-32.

In addition to materials experts, Mr. Whyte and Black & Decker also retained experts to opine on the adequacy of the hammer's warning label.  Mr. Whyte retained the same expert, Mr. Turek, to opine on the warning label.  ECF 37-10.  Black & Decker retained Dr. Stephen Young.  ECF 37-14.  The hammer had a warning label on its handle, which stated: "**WARNING**: TOOLS OR STRUCK OBJECT CAN CHIP. USER AND BYSTANDERS WEAR SAFETY GOGGLES."  ECF 37-10, p. 17, Fig. 9; ECF 37-14, p. 10.  Mr. Turek concluded that this warning was insufficient.  ECF 37-10, p. 10.  Dr. Young disagreed, opining that the warning label was sufficient and reasonable.  ECF 37-14, p. 13.

In asserting their respective positions, both sides reference the American Society of Mechanical Engineers ("ASME") standard, a purportedly relevant industry standard for the hammer.  Relevant to this dispute, the ASME standard recommends that a hammer's warning label warn the user and bystanders to wear safety goggles (the "ASME warning-label standard").  ECF 37-10, p. 22.  Additionally, the ASME standard recommends various other "safety requirements and limitations of use," including not hitting the hammer against hardened surfaces and not using the hammer if it's mushrooming.  *Id.*

Following discovery, the parties now agree that Mr. Whyte's claims are solely based on the allegedly defective warning Black & Decker placed on the hammer (rather than a manufacturing defect or design defect of the hammer).  ECF 36, pp. 14-15; ECF 40, pp. 9-10.  As discussed below, the alleged warning defect appears to

be the hammer's lack of warnings against the use of a "mushrooming" hammer and the use of the hammer against a harder surface.

Black & Decker has filed two related motions.  Black & Decker moves to exclude the portions of Mr. Turek's report and testimony regarding the hammer's warnings. ECF 38.  Black & Decker argues that Mr. Turek is not qualified to testify as an expert on the adequacy of the warning label.  Black & Decker also argues that Mr. Turek's testimony on the warning label is not reliable, and thus must be excluded on that basis as well.

Additionally, Black & Decker moves for summary judgment on all four of Mr. Whyte's claims.  ECF 35.  Black & Decker argues that Mr. Whyte's claims fail as a matter of law, and moreover, that if the Court excludes Mr. Turek's opinion, Mr. Whyte cannot present enough evidence to get to a jury on his claims.

Mr. Whyte opposes both motions, arguing that Mr. Turek is qualified through his practical experience, and that his testimony is sufficiently reliable.  ECF 43.  Mr. Whyte also argues that the Court should deny summary judgment because there are genuine disputes of material fact as to each claim, even if Mr. Turek's testimony is excluded.  ECF 40.  The parties have fully briefed both motions.  Both parties agree that no *Daubert* hearing is necessary for the motion to exclude, and the Court does not otherwise believe one is needed.  *See* Order, ECF 45 (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136, 154 (3d Cir. 2000)).  Therefore, both motions are ready for disposition.

## LEGAL STANDARD

In considering Black & Decker's motion to exclude portions of Mr. Turek's expert opinion, the Court applies the following standard. An expert witness's testimony is admissible only if (1) the witness is qualified to testify as an expert, (2) the testimony is reliable, and (3) the testimony is relevant.  *See UGI Sunbury LLC v. A Permanent Easement*, 949 F.3d 825, 832 (3d Cir. 2020).  If any of these three

- 4 -

requirements are not satisfied, the expert's testimony is inadmissible under Rule 702 of the Federal Rules of Evidence. *See id.* The proponent of the expert testimony bears the burden to show by a preponderance of the evidence that their expert's opinion is reliable. *See Oddi*, 234 F.3d at 144.

In considering Black & Decker's motion for summary judgment, the Court applies the familiar standard under Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the Court must ask whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In making this determination, "all reasonable inferences from the record must be drawn in favor of the nonmoving party and the court may not weigh the evidence or assess credibility." *Goldenstein v. Repossessors, Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (cleaned up). The moving party bears the initial burden to show the absence of a genuine dispute of material fact, and "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is improper. *Id.* (citation omitted).

But if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment "is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal

memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citation omitted).

## DISCUSSION & ANALYSIS

Because Black & Decker's motion to exclude portions of Mr. Turek's testimony implicates the evidence that the Court will consider on summary judgment, the Court will first address the motion to exclude, before turning to Black & Decker's motion for summary judgment.

## I. Mr. Turek is qualified to testify as an expert, but his testimony on the hammer's warnings must be excluded as unreliable.

Black & Decker moves to exclude Mr. Turek's expert report and testimony regarding the adequacy of the hammer's warnings.[2]

Under Rule 702 of the Federal Rules of Evidence, the Court serves as the "gatekeeper" of expert testimony by "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). "As gatekeeper, a trial judge has three duties: (1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is sufficiently tied to the facts of the case, so that it fits the dispute and will assist the trier of fact." *UGI Sunbury*, 949 F.3d at 832 (cleaned up). Here, Black & Decker argues that Mr. Turek fails the first two requirements, *i.e.,* that Mr. Turek is purportedly unqualified to testify as an expert on the adequacy of the

---

[2] In addition to opining on the hammer's warnings, Mr. Turek's report and testimony also address the material composition of the hammer. *See generally* ECF 37-10. Black & Decker concedes that Mr. Turek is qualified to testify as an expert on the hammer's materials. *E.g.*, ECF 39, p. 9. Black & Decker also concedes that Mr. Turek's testimony on the hammer's materials is reliable. *E.g.*, ECF 47, p. 3. As such, Black & Decker seeks to exclude Mr. Turek's testimony only as it relates to the hammer's warnings.

hammer's warnings, and that Mr. Turek's expert report and testimony on the hammer's warnings are not reliable.

For the reasons discussed below, the Court finds that Mr. Turek is qualified to testify as an expert. However, Mr. Turek's testimony on the hammer's warnings is not sufficiently reliable. The Court will therefore grant Black & Decker's motion to exclude Mr. Turek's report and testimony regarding the hammer's warnings. ECF 38.

### A. Mr. Turek is qualified to testify as an expert on the hammer's warnings.

To be qualified as an expert, the witness must have "specialized knowledge." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). But the specialized-knowledge requirement is applied "liberally," and the Third Circuit has "eschewed imposing overly rigorous requirements of expertise" so long as the expert has sufficient "generalized qualifications." *Id.* "The basis of [the expert's] specialized knowledge can be practical experience as well as academic training and credentials." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (citation omitted). Further, the expert does not need "to be the best qualified or . . . have the specialization that the court considers most appropriate." *Pineda v. Ford Motor Co.,* 520 F.3d 237, 244 (3d Cir. 2008). Instead, the proffered expert witness need only possess some "skill or knowledge greater than the average layman" that is relevant to the issue at hand. *Elcock*, 233 F.3d at 741 (cleaned up).

Here, while a close call, the Court finds—applying the "liberal" qualification standard—that Mr. Turek has enough practical experience to be qualified as an expert on the hammer's warnings. Though Mr. Turek's practical experience arises primarily from laboratories and chemical safety procedures, he does have several decades of experience with safety procedures and warnings. Mr. Turek has authored safety manuals, developed and overseen the implementation of laboratory safety procedures, and regularly handled hazardous materials that require the review and

implementation of safety warnings and procedures.  ECF 37-12, pp. 46, 83-84.  As a result, Mr. Turek certainly has "skill or knowledge greater than the average layman" on this subject.  *See Elcock*, 233 F.3d at 741.  The Court finds that this is enough to qualify Mr. Turek as an expert on the hammer's warnings.

In arguing otherwise, Black & Decker raises several arguments, including: Mr. Turek has no relevant formal education;[3] Mr. Turek's experiences relate only to laboratories and chemicals rather than hand tools; Mr. Turek has not drafted specific warning labels; Mr. Turek is not aware of any research or publications concerning warning labels; and Mr. Turek has been involved in only one case involving warning labels (in which he was not the warnings expert).  *E.g.*, ECF 39, pp. 8-9 (citing Mr. Turek's deposition testimony).

The Court concludes, however, that these arguments impose "overly rigorous requirements of expertise," and clash with the Third Circuit's instructions to apply the qualification standard liberally, such that "generalized qualifications" are sufficient.  *See Paoli*, 35 F.3d at 741.  Instead, the Court finds that the disputed nature of Mr. Turek's qualifications is more relevant to the *reliability* of his

---

[3] Throughout its briefs, Black & Decker emphasizes that Mr. Turek has no academic experience on product warning labels.  But practical experience, even without relevant formal education, can be enough to qualify a witness as an expert.  *See Elcock*, 233 F.3d at 741.

testimony. *See, e.g.*, *id.* ("[T]he level of expertise may affect the reliability of the expert's opinion."); *Elcock*, 233 F.3d at 749 (same).

As such, the Court concludes that Mr. Turek is sufficiently qualified to testify as an expert on the hammer's warnings.

### B. Mr. Turek's testimony is not sufficiently reliable and will thus be excluded.

Black & Decker next argues that even if Mr. Turek is qualified, his testimony must be excluded because it is not reliable.  The Court agrees.

After determining an expert is qualified, the "trial judge must ensure that any and all [expert] testimony . . . [is] reliable." *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co.*, 526 U.S. at 141.  To be sufficiently reliable, the expert's testimony need not have "the best foundation, or even . . . [be] supported by the best methodology or unassailable research." *UGI Sunbury*, 949 F.3d at 834 (citation omitted).  Rather, the testimony must be supported by "good grounds," using a reliable methodology. *See id.*  A court considers various factors to determine whether the testimony is supported by "good grounds," including: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *See id.*

Implicit in these factors is that the expert's testimony is based on a discernable methodology, which the Court may assess by applying these factors to it. *See Paoli*, 35 F.3d at 744 ("The focus must be solely on principles and methodology, not on the conclusions that they generate." (cleaned up)).  But if there is no discernable methodology, the Court need not—indeed ***cannot***—apply the "good grounds" factors.

*Cf. Kumho Tire Co.*, 526 U.S. at 142 ("[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.").

Indeed, when the expert's testimony relies on his or her subjective beliefs or unsupported assertions, there is no methodology for the Court to assess, and thus the testimony is unreliable. *See UGI Sunbury*, 949 F.3d at 833-34 ("Rule 702's reliability threshold requires expert testimony to be based on the methods and procedures of science, not on subjective belief and unsupported speculation." (citation omitted)). Such testimony must therefore be excluded. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *see, e.g., Reger v. A.I. duPont Hosp. for Children of Nemours Found.*, 259 F. App'x 499, 500 (3d Cir. 2008) ("The district court precluded [the expert's] testimony on this issue because [the expert's] opinion is based on his subjective belief . . . . That was not an abuse of discretion. Quite simply, [the expert's] *ipse dixit* does not meet Rule 702's reliability requirement." (cleaned up)); *Fedor v. Freightliner, Inc.*, 193 F. Supp. 2d 820, 829–30 (E.D. Pa. 2002) ("While his speculation is informed by his training and experience . . . , [the expert's] opinions . . . clearly lack any identifiable methodology which defendants could challenge."); *Westfield Ins. v. Detroit Diesel Corp.*, No. 10–100, 2012 WL 1611311, at *6 (W.D. Pa. May 8, 2012) (Gibson, J.) ("[The expert's] reports amount to a series of unsubstantiated conclusory statements backed by no identifiable scientific methodology. In essence, neither Plaintiff nor [the expert] provide support for his conclusion apart from the fact that he himself said it. Such *ipse dixit* is insufficient to satisfy Rule 702.").

The proponent of the expert testimony—here, Mr. Whyte—bears the burden to show by a preponderance of the evidence that the expert's opinion is reliable. *See*

*Oddi*, 234 F.3d at 144.  Because Mr. Whyte fails to meet his burden, Mr. Turek's testimony on the hammer's warnings must be excluded.

In his report, Mr. Turek made two conclusions regarding the hammer's warnings: (1) the hammer did not have any warnings that "inform[ed]" the user of "the applicable ASME safety requirements"; and (2) the hammer had "insufficient safety information . . . to adequately inform" the user of the "ASME requirements . . . [and] known hazardous issues."  ECF 37-10, p. 10.  But neither Mr. Whyte nor Mr. Turek show that Mr. Turek's conclusions are based on a reliable—or even discernable—methodology.

Looking first at Mr. Turek's report, the Court finds that it does not provide any discernable methodology.  Of his 20-page report, a total of one page addresses the sufficiency of the hammer's warnings.  *See generally* ECF 37-10; *see also* ECF 37-12, pp. 54-55.  And of this single page, the Court cannot discern any methodology that underlies Mr. Turek's opinions.  While Mr. Turek's report summarized certain hazards listed in the relevant ASME standard (ECF 37-10, p. 9), his report does not address how or why he reached the conclusions that the hammer's warnings were inadequate.[4]

Mr. Turek's deposition testimony sheds no further light on the matter.  To the contrary, his deposition testimony shows that his conclusions are simply based on his subjective beliefs and unsupported assertions.  In explaining how he concluded that the hammer did not have any warnings that "inform[ed]" the user of "the applicable

---

[4] Further, Mr. Turek's report states that the only evidence and documents he reviewed in preparing his report were the "joint destructive examination" of the hammer (involving the "failed and exemplar hammers and stamping tool"), and the relevant ASME standard.  ECF 37-10, p. 4.  Though Mr. Turek supplemented his report about five months later to state that he subsequently reviewed several more documents and deposition testimony, Mr. Turek did not modify or change his original report.  ECF 32-2.  Thus, the substance of Mr. Turek's conclusions in his report are based solely on his original review of the examination of the hammer's materials and the ASME standard.

ASME safety requirements," Mr. Turek testified that he "look[ed] at the hammer" and then—based on his materials analysis of why the hammer broke, the ASME safety recommendations, and his "personal experience"—he reached his conclusion. ECF 37-12, pp. 56-57. This does not articulate any sort of standard or methodology that the Court can assess. Mr. Turek does not explain why he assessed these factors, but not others. Nor does he explain how he weighed these factors. And he likewise fails to explain what aspects of his "personal experience" led him to his conclusions. Put simply, Mr. Turek does not provide any discernable standard or methodology. *See, e.g.*, *Elcock*, 233 F.3d at 747-48 ("[W]ithout an inkling as to the standards controlling [the expert's] method—*i.e.*, how he excludes for other variables, such as [Plaintiff's] pre-existing injuries or job limitations—an expert trying to reproduce [the expert's] methods would be lost.").

Moreover, although Mr. Turek stated he relied on the ASME standards, the mere reliance on such a standard—without explanation of how he implemented the standard—fails to show that Mr. Turek's testimony is reliable. *See Ruggiero v. Yamaha Motor Corp.*, 778 F. App'x 88, 93 (3d Cir. 2019) ("As the [District] Court explained, while [the expert] relies on an ANSI standard, he has failed to articulate his methodology supporting how he arrived at the conclusion . . . . Absent an appropriate explanation, [the expert's] reliance on the ANSI standards is the type of 'subjective belief or unsupported speculation' that does not satisfy Rule 702." (cleaned up)).

Similarly, Mr. Turek appears to have simply relied on his subjective beliefs in reaching his second conclusion: that the hammer had "insufficient safety information . . . to adequately inform" the user of the "ASME requirements . . . [and] known hazardous issues." Mr. Turek testified that he based this conclusion on Mr. Whyte's co-workers not being aware of the ASME safety standards. ECF 37-12, pp. 75-76. And because Black & Decker's hammer complied with the ASME warning-label

- 12 -

standard, Mr. Turek further testified that the ASME warning-label standard itself was "insufficient." *Id.* at pp. 76-77.

But Mr. Turek fails to explain how or why he reached these conclusions. He admits to not having conducted any research to support his conclusions. *Id.* at p. 77. He also admits to not being aware of a single article or standard that supports his conclusions. *Id.* Instead, he testified that he believed a warning label must be provided whenever there's a risk of significant injury—and he based this assertion simply on "common sense." *Id.* at pp. 80-81. That is not enough.

Accordingly, Mr. Turek's "*ipse dixit* does not meet Rule 702's reliability requirement." *Reger*, 259 F. App'x at 500 (citation omitted); *see, e.g., UGI Sunbury*, 949 F.3d at 834 ("[The expert reports] lack any suggestion that the [expert's theory] has been subject to peer review or enjoys general acceptance. Nor do they contain any analysis of a known or potential rate of error. Or any standards controlling the theory's application. Each, instead, comes from [the expert's] anecdotal experience in his grandfather's appliance shop . . . . [The expert's conclusions] may be true. But it is impossible to test a hypothesis generated by a subjective methodology because the only person capable of testing or falsifying the hypothesis is the creator of the methodology." (cleaned up)).[5]

Finally, Mr. Turek's limited credentials as a "warnings expert" further bolster the Court's conclusion. As discussed above, his credentials are barely enough on the

---

[5] In his opposition brief, Mr. Whyte argues that Mr. Turek provides an adequate methodology through Mr. Turek's reliance on the ASME standard and his testing of the hammer's materials. ECF 43, pp. 9-11. But as explained above, merely invoking the ASME standard, without further explanation, is insufficient. Further, the testing to which Mr. Whyte refers concerned Mr. Turek's analysis of the hammer's *materials*, not the hammer's *warnings*, and is thus not relevant to the issues here. As well, Mr. Whyte references Mr. Turek's deposition testimony (*id.* at pp. 10, 12), but, as already explained, this weighs against admitting Mr. Turek's opinion. At bottom, Mr. Whyte simply re-states Mr. Turek's report and deposition testimony. Mr. Whyte's arguments are therefore unavailing.

issue of the hammer's warnings.  And the Court can consider this in assessing the reliability of his expert opinion.  While Mr. Turek meets the liberal standard for qualification, his lack of experience and knowledge (both academically and practically) with product warnings outside the laboratory weigh in favor of finding his testimony unreliable.  *See, e.g.*, *Elcock*, 233 F.3d at 749 ("[A]n expert's level of expertise may affect the reliability of the expert's opinion. In light of [the expert's] qualifications [being] marginal at best, and mindful of the District Court's statement that the question of [the expert's] qualifications was a close call, we believe that this factor also weighs in favor of excluding [the expert's] testimony." (cleaned up) (citations omitted)).

For these reasons, the Court finds that Mr. Turek's testimony on the hammer's warnings was not based on any discernable or reliable methodology.  As such, Mr. Turek's testimony and reports on the hammer's warnings does not pass muster under Rule 702, so Black & Decker's motion to exclude (ECF 38) will be granted.  The Court will therefore exclude the portions of Mr. Turek's opinion related to the hammer's warnings, for purposes of both summary-judgment and trial.

## II.    The Court will deny summary judgment on Counts I-III but grant summary judgment on Count IV.

The Court turns next to Black & Decker's motion for summary judgment.  ECF 35.  Mr. Whyte's amended complaint presents four claims, arising from allegations of the hammer's defects: (1) strict liability, (2) negligence, (3) breach of implied warranty, and (4) breach of express warranty.  *See generally* ECF 18.  Following

discovery, the parties agree that the only remaining viable ground for a defect is a failure-to-warn defect.  *See* ECF 36, pp. 14-15; ECF 40, pp. 9-10.[6]

Black & Decker moves for summary judgment on all four of Mr. Whyte's claims.  The Court addresses each claim in turn.

### A. The Court will deny summary judgment on Mr. Whyte's strict-liability failure-to-warn claim (Count I).

For the reasons discussed below, the Court will deny Black & Decker's motion for summary judgment on Mr. Whyte's strict-liability claim.

Following the Second Restatement of Torts, Pennsylvania recognizes a strict-liability claim arising from a defective warning. *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 415 (Pa. 2014); *Phillips v. A-Best Products Co.*, 665 A.2d 1167, 1170 (Pa. 1995). To succeed on a strict-liability failure-to-warn claim, the plaintiff "must establish only two things: [(1)] that the product was sold in a defective condition 'unreasonably dangerous' to the user, and [(2)] that the defect caused plaintiff's injury." *Phillips*, 665 A.2d at 1171; *Pavlik v. Lane Ltd.*, 135 F.3d 876, 881 (3d Cir. 1998) (citation omitted); *see also Dorshimer v. Zonar Sys.*, 145 F. Supp. 3d 339, 353 (M.D. Pa. 2015) ("The adequacy of the warning is evaluated solely on the basis of whether the warning was inadequate and a better warning would have prevented the injury." (cleaned up)).

### i. There are genuine disputes of material fact as to whether the hammer was defective.

The first element of a strict-liability claim is that the product be defective.  A product is defective if it has an inadequate warning that made the product "unreasonably dangerous." *Phillips*, 665 A.2d at 1171; *see also Pavlik*, 135 F.3d at 881 ("[A]n otherwise properly designed product may still be unreasonably dangerous (and therefore 'defective') for strict liability purposes if the product is distributed without sufficient warnings to apprise the ultimate user of the latent dangers in the

---

[6] As such, any claims based on a manufacturing defect or design defect will be dismissed with prejudice.

product."). Whether the product is "unreasonably dangerous" is a question for the jury. *See Tincher*, 104 A.3d at 335 ("Whether a product is in a defective condition is a question of fact ordinarily submitted for determination to the finder of fact."); *Amato v. Bell & Gossett*, 116 A.3d 607, 620 (Pa. Super. Ct. 2015).[7] This question can be removed from the jury "only where it is clear that reasonable minds could not differ on the issue." *Tincher*, 104 A.3d at 335; *see also Goldenstein*, 815 F.3d at 146.

Here, the Court finds that a jury must decide whether the hammer was "unreasonably dangerous." Notwithstanding the Court's exclusion of Mr. Turek's expert testimony regarding the hammer's warnings, there remains a genuine factual dispute as to whether the hammer's warnings made the hammer unreasonably dangerous, and thus defective.

To be sure, much of the evidence here is not disputed. For example, it is undisputed that the hammer's head was "mushrooming" (*i.e.*, deforming). *E.g.*, ECF 37-10, p. 7; ECF 37-13, p. 10. It is also undisputed that the "mushrooming" led to, or caused, the hammer to crack or chip and thus injure Mr. Whyte. *E.g.*, ECF 37-10, p. 7; ECF 37-13, pp. 26, 32. It is similarly undisputed that the hammer was used to strike an object (the stamping die) that was harder than the hammer. *E.g.*, ECF 37-10, p. 9; ECF 37-13, p. 32. And it's undisputed that this hardness factor led to, or caused, the hammer to crack or chip and thus injure Mr. Whyte. *E.g.*, ECF 37-10, p. 10; ECF 37-13, pp. 31-32. Finally, it's undisputed that the hammer's warning label

---

[7] The Pennsylvania Supreme Court in *Tincher* held that the issue of a product's defect is generally for the jury to resolve. While the court expressly limited its holding to cases involving a defective design, the court also recognized that its decision "may have an impact upon other foundational issues regarding manufacturing or ***warning claims***." *Tincher*, 104 A.3d at 390, n.21, 431-32 (emphasis added). Since then, Pennsylvania courts have held that the question of a product's defectiveness for a failure-to-warn claim is for the jury to resolve. *See, e.g.*, *Amato v. Bell & Gossett*, 116 A.3d 607, 620 (Pa. Super. Ct. 2015). In any event, the parties do not appear to argue that the Court alone determines whether a product is defective, particularly where, as here, material disputes of fact exist.

said nothing about using a hammer that was mushrooming, or using the hammer against a harder surface. *E.g.*, ECF 37-10, p. 17, Fig. 9; ECF 37-14, p. 10. Thus, the hammer's warning label said nothing about these factors that ultimately resulted in Mr. Whyte's injury.

But while this evidence is undisputed, a jury must nonetheless make the fact-laden judgment of whether the hammer's warning label was defective, given these facts as well as other competing considerations and evidence. The Court can decide the question of the hammer's defectiveness "only where it is clear that reasonable minds could not differ on the issue." *Tincher*, 104 A.3d at 335. Because the Court concludes that reasonable minds could differ here, the question as to the hammer's defectiveness must go to the jury. In making that determination, the jury will have to weigh the credibility of witnesses and consider the weight of the evidence on a number of disputed matters.

For example, while both sides acknowledge that previous users have had a hammer chip and pierce their body, Black & Decker asserts that this did not occur with enough frequency or severity to justify a warning label. Mr. Whyte, after his injury, learned that one of his co-workers had a piece of a hammer stick in his arm after it chipped. ECF 37-1, p. 148. Likewise, Black & Decker's expert, Dr. Young, acknowledges that others have experienced injuries similar to Mr. Whyte's, including "when [a] piece of metal dislodged & entered [the user's] chest." ECF 37-14, p. 11. But Dr. Young opines that such injuries do not warrant additional warning labels. *Id.* ("So, while there are some incidents in the NEISS data that are similar to the injury scenario involved in the present instance, there aren't many of them[.]"). Thus, a jury must weigh the evidence to determine whether the history, risk, and severity

of Mr. Whyte's injury, and similar injuries, warrant an additional warning label, such that the hammer is unreasonably dangerous without it.

Indeed, reasonable minds could certainly differ on whether no additional warnings are needed, when considering, for example, the severity of the potential injury and the fact that a similar injury *had* previously occurred in Mr. Whyte's workplace, notwithstanding the purported rarity of such severe injuries occurring. What's more, as Dr. Young opines, the jury must also consider the risk of "overwarning." According to Dr. Young, if the hammer's current warning label is insufficient, that means a plethora of additional warning labels would be needed to ensure that all feasible risks were addressed, resulting in "overwarning." *Id.* at pp. 11-12. Yet simultaneously, as Mr. Whyte can present at trial, the jury could also consider that Mr. Whyte and many of his co-workers (as discussed below) were unaware that the hammer could chip with sufficient velocity and force to pierce their abdomen. The jury must therefore weigh the risk of overwarning against the risk of not informing the hammer's users of known and serious injury risks. This will turn, at least in part, on the credibility of the witnesses at trial.

Accordingly, while many relevant facts are undisputed, they leave genuine disputes of material fact—including disputes on the dispositive question of whether the hammer was "unreasonably dangerous" due to its allegedly inadequate warning. This is for the jury to decide, while weighing the competing risks and other factors that could justify or excuse additional warning labels on the hammer. The Court therefore concludes that summary judgment is improper.

Arguing otherwise, Black & Decker asserts that there can be no genuine dispute as to the hammer's defectiveness because Mr. Turek's testimony is excluded, and without that evidence, Mr. Whyte cannot prove his case to a jury. ECF 36, pp. 24-25. The Court disagrees. While expert testimony is generally required for complex issues, a jury is capable—without expert testimony—of deciding whether a simple

warning label, like the one here, is inadequate so as to render the product unreasonably dangerous. *See Dion v. Graduate Hosp. of Univ. of Pa.*, 520 A.2d 876, 881 (Pa. Super. Ct. 1987) ("Where any layperson can understand the insufficiency of a warning, expert testimony is not necessary.").

Here, the hammer's warning label is not complicated.  It simply states, "**WARNING**: TOOLS OR STRUCK OBJECT CAN CHIP.  USER AND BYSTANDERS WEAR SAFETY GOGGLES."  ECF 37-10, p. 17, Fig. 9; ECF 37-14, p. 10.  The Court concludes that a lay jury can adequately assess this straightforward warning label, even without Mr. Turek's testimony.  Moreover, not only is the warning label easy to comprehend, the product itself—a hammer—is relatively simple and well known to a layman; and further simplifying the factual issues, this case does not involve alleged defects as to the more complex matters of the hammer's design or manufacturing.  *See Oddi*, 234 F.3d at 159 ("As a general principle, expert evidence is not necessary if all the primary facts can be accurately and intelligibly described to the jury, and if they, as persons of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training of the subject under investigation." (cleaned up)).  The Court thus concludes that the exclusion of Mr. Turek's testimony on the hammer's warnings does not compel summary judgment.

For these reasons, the Court finds that there are genuine disputes as to whether the hammer's warning label was inadequate to render the hammer unreasonably dangerous and thus defective.

### ii. There are genuine disputes of material fact as to whether the alleged defective warning caused Mr. Whyte's injury.

The second element of a strict-liability failure-to-warn claim is that the defective warning caused the plaintiff's injury.  In other words, "the plaintiff must demonstrate that the user of the product would have avoided the risk had he or she

been warned of it by the seller." *Phillips*, 665 A.2d at 1171. For the defendant-movant to prevail on summary judgment, "the record must show that a reasonable fact finder would be bound to find that [Plaintiff] was fully aware of the risk of bodily injury [before his injury]; otherwise, we are presented with a genuine issue of fact for the jury." *Pavlik*, 135 F.3d at 884. Further, the plaintiff "enjoys the benefit of a rebuttable presumption that an adequate warning would have been heeded if it had been provided." *Id.* at 881; *Davis v. Berwind Corp.*, 690 A.2d 186, 190 (Pa. 1997). Here, the Court finds that there are genuine disputes of material fact that preclude summary judgment.

Black & Decker makes two primary arguments in asserting that Mr. Whyte is unable to prove that the allegedly defective warning caused his injury. First, Black & Decker asserts that there is no evidence that Mr. Whyte examined the hammer's warning label. ECF 36, pp. 18-19. Second, Black & Decker asserts that Mr. Whyte was already aware of the risk that pieces of the hammer could break off and hit him, and Mr. Whyte purportedly admitted that no further warning was necessary. *Id.* at pp. 19-23. The Court finds both arguments ultimately unpersuasive to warrant summary judgment.

At the outset, Mr. Whyte "enjoys the benefit of a rebuttable presumption" that he would have heeded an adequate warning if it had been provided.[8] *Pavlik*, 135 F.3d

---

[8] Some Pennsylvania courts have opined that the heeding presumption applies only to the toxic-tort (*e.g.*, asbestos) context. *See, e.g.*, *Dolby v. Ziegler Tire & Supply Co.*, No. 694 WDA 2016, 2017 WL 781650, at *5 (Pa. Super. Ct. Feb. 28, 2017) ("[Plaintiff's] reliance upon the heeding presumption doctrine is misplaced as the doctrine has been authorized in Pennsylvania only in cases involving workplace exposure to asbestos.") (citing two Pennsylvania Superior Court cases). Yet numerous federal courts in Pennsylvania, including the Third Circuit, have applied Pennsylvania's heeding presumption outside the toxic-tort context. *See, e.g.*, *Pavlik*, 135 F.3d at 881; *Dorshimer*, 145 F. Supp. 3d at 355; *Trask v. Olin Corp.*, No. 12-340, 2016 WL 1181428, at *13 (W.D. Pa. Mar. 28, 2016) (Fischer, J.); *Flanagan v. martFIVE, LLC*, 259 F. Supp. 3d 316, 320-21 (W.D. Pa. 2017) (Schwab, J.); *Kurzinsky v. Petzl Am., Inc.*, No. 17-1234, 2019 WL 220201, at *4 (E.D. Pa. Jan. 16, 2019). Further, the Pennsylvania

at 881.  Thus, as to Black & Decker's first argument (that Mr. Whyte did not examine the hammer's warning label), Black & Decker must rebut this presumption to prevail on summary judgment.  Accordingly, Black & Decker "must produce evidence that [an adequate] warning would not have been heeded."  *Flanagan v. martFIVE, LLC*, 259 F. Supp. 3d 316, 321 (W.D. Pa. 2017) (Schwab, J.) (citation omitted).  Black & Decker has failed to do so.

Instead, Black & Decker argues that there is no evidence Mr. Whyte looked at the warning label because Mr. Whyte purportedly admitted as much.  ECF 36, p. 18. Black & Decker relies on Mr. Whyte's deposition testimony, where Black & Decker asked him if he "recall[ed] seeing [the] warning on the handle of the hammer," and Mr. Whyte answered, "not specifically."  *Id.* (citing ECF 37-1, p. 143).[9]

Affording Mr. Whyte the heeding presumption, and drawing all reasonable inferences in Mr. Whyte's favor, the Court finds that Black & Decker has not met its

---

Supreme Court—in a case *not* involving asbestos or other toxic torts—opined that "the law presumes that warnings will be obeyed."  *Davis*, 690 A.2d at 190.  Finally, the parties do not dispute that the heeding presumption applies here.  *See* ECF 36, p. 19 (Black & Decker acknowledging that "Pennsylvania law presumes that warnings will be obeyed").  Accordingly, like its sister district courts and the Third Circuit, this Court concludes that the heeding presumption applies here.

[9] In full, Mr. Whyte testified:

Q: Do you recall seeing that warning before using the hammer?

A: Not really, probably never even noticed it.

Q: Did you even need that warning because you were already wearing safety glasses?

A: It's protocol in the shop.

Q: Let's look at [Deposition] Exhibit 20 then.  Do you recall seeing this warning on the handle of the hammer?

A: Not specifically.

burden on summary judgment.  Mr. Whyte's deposition testimony upon which Black & Decker relies stops short.  When read in context, the testimony can reasonably be interpreted to concern Mr. Whyte's specific recollection of viewing the label on the night of the incident.  He was not specifically asked if he had read the warning at any other time, and in his brief, Mr. Whyte represents that he had read the warning on the hammer in the past, and will testify as much at trial.  *See* ECF 40, pp. 11-12.  The snippet of deposition testimony doesn't create an undisputed factual basis on which to rebut the heeding presumption to which Mr. Whyte is entitled.

Likewise, Black & Decker's second argument—that Mr. Whyte knew the risk that pieces of the hammer could break off and hit him, and he purportedly admitted that no further warning was necessary (ECF 36, pp. 19-23)—also falls short on summary judgment.  This is because, for Black & Decker to prevail on summary judgment, "the record must show that a reasonable fact finder would be bound to find that [Plaintiff] was ***fully aware of the risk of bodily injury*** [before his injury]; otherwise, we are presented with a genuine issue of fact for the jury."  *Pavlik*, 135 F.3d at 884 (emphasis added).  As Black & Decker argues, it's undisputed that Mr. Whyte knew that pieces of the hammer could break off and hit him.  *E.g.*, ECF 37-1, p. 146 (Mr. Whyte affirming that he was "well aware that there's always the possibility that a hammer could chip when you're striking something").   But to be "***fully aware*** of the risk of bodily injury," not only must Mr. Whyte have known that pieces of the hammer could chip and hit him, Mr. Whyte must have been aware— before his injury—of the materially different risk that a piece could chip off with

---

ECF 37-1, p. 143.

enough velocity and force to puncture and penetrate his abdomen.  This Black & Decker has not shown.

Indeed, contrary to Black & Decker's position, Mr. Whyte's awareness of the risk of a *lesser* injury does not necessarily make him fully aware of a more *significant* injury, even if the lesser and more significant injuries can result from the same cause. *See, e.g.*, *Pavlik*, 135 F.3d at 885 ("It is tempting to superimpose upon the record our own street-wise assumption that everyone knows the dangers (and warning signs) of butane abuse. But, as judges, we cannot do so. Since we must decide whether [Plaintiff] was fully aware of the danger of bodily harm posed by butane inhalation, and since there may be ***degrees of apprehension of danger with respect to the seriousness of harm***, viewing this evidence in the light most favorable to the plaintiffs, we cannot agree with defendants. (emphasis added));[10] *Petree v. Victor Fluid Power, Inc.*, 831 F.2d 1191, 1196 (3d Cir. 1987) ("[T]he fact that the employer and operators may have been aware of a projectile hazard does not necessarily establish that they were fully aware of the risk of bodily injury[.]").  Thus, while Mr. Whyte was aware that pieces of the hammer could chip and contact his body or injure his eyes, that does not automatically render him fully aware of the risk of bodily

---

[10] In its reply brief, Black & Decker unsuccessfully tries to distinguish *Pavlik* by arguing that this case is more like *Overpeck*—a case cited by the court in *Pavlik*. *See* ECF 46, pp. 11-12.  But as the court in *Pavlik* noted, the plaintiff in *Overpeck* "specifically testified that he was aware that the mounting tool might fly off during operation. In fact, he further indicated that ***he knew how to prevent the precise injury caused in that case***."  *Pavlik*, 135 F.3d at 888 (citing *Overpeck v. Chicago Pneumatic Tool Co.*, 823 F.2d 751, 755-56 (3d Cir. 1987)) (emphasis added).  In other words, the plaintiff in *Overpeck* was fully aware of the risk at issue.  In *Pavlik*, on the other hand, there was a dispute of fact as to whether the plaintiff was fully aware of his precise injury. *See id.* ("In this case, we are not presented with similarly uncontroverted evidence demonstrating that [Plaintiff] was aware at the time of his accident that inhaling butane could cause sudden death or serious bodily harm [*i.e.*, the actual harm that resulted].").  This case is more like *Pavlik*, as the record does not establish that Mr. Whyte knew that his "precise injury" could result.

injury, including of the rather severe risk of a projectile piercing his abdomen, through his clothing, and lodging in his organ.

The record here demonstrates that Mr. Whyte,[11] before his injury, was not aware that pieces of the hammer could chip off with enough force and velocity to penetrate his abdomen. *E.g.*, ECF 37-1, p. 148 (Mr. Whyte testifying that he learned, only after his injury, that a co-worker had a piece of a hammer chip off and stick in his arm). Black & Decker points to nothing in the record suggesting otherwise. Further, while Black & Decker emphasizes that Mr. Whyte, during his deposition, conceded he was aware of the risk of a hammer chipping (ECF 36, p. 20 (citing ECF 37-1, p. 145)), this does not show that Mr. Whyte was fully aware that the chipping and force could be so severe that a piece of hammer or metal could travel through his clothing and penetrate his abdomen. Black & Decker thus falls short of its burden on summary judgment.

Accordingly, the Court will deny summary judgment on Count I.

**B. The Court will deny summary judgment on Mr. Whyte's negligence claim (Count II).**

The Court will also deny Black & Decker's motion for summary judgment on Mr. Whyte's negligence claim.

To succeed on a negligence claim, the plaintiff must prove four elements: "[(1)] the defendant had a duty to conform to a certain standard of conduct; [(2)] the defendant breached that duty; [(3)] such breach caused the injury in question; and [(4)] actual loss or damage." *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1008 (Pa. 2003) (cleaned up). Unlike a strict-liability claim, which focuses on the product and

---

[11] Black & Decker also asserts that Mr. Whyte's co-workers knew that pieces of the hammer could chip off and contact their body. ECF 36, pp. 20-21. But Mr. Whyte's co-workers' knowledge cannot be imputed to Mr. Whyte. And it's not clear that even his co-workers, or at least many of them, were "fully aware" of the risk of bodily injury.

"eschews considerations of the reasonableness of the conduct of the manufacturer," a negligence claim focuses on the reasonableness of the defendant's conduct, rather than the product. *Id.*

In moving for summary judgment, Black & Decker argues that Mr. Whyte is unable to show (1) that Black & Decker breached its duty, and (2) that any such breach caused Mr. Whyte's injury. ECF 36, p. 26.

The Court can quickly dispense with the latter argument, regarding causation, because the issue of causation is common to both a strict-liability claim and a negligence claim. As such, the Court's above discussion on the causation element of Mr. Whyte's strict-liability claim applies equally here. *See, e.g.*, *Giacalone v. Lacrimedics, Inc.*, No. 07-2212, 2008 WL 11365183, at *6 (E.D. Pa. Nov. 24, 2008) ("[C]ausation remains an element of both negligence and strict liability. Therefore, our analysis of causation in strict liability can similarly be applied to Plaintiff's claims in negligence.").

Turning next to Black & Decker's arguments that Mr. Whyte cannot show Black & Decker breached a duty, the Court is not persuaded. To prevail at trial on the element of breach, Mr. Whyte must show that Black & Decker "acted unreasonably." *Kline v. Zimmer Holdings, Inc.*, 662 F. App'x 121, 123 (3d Cir. 2016) (citing *Phillips*, 841 A.2d at 1008). "Reasonableness requires comparing the risk and the utility of the alleged acts or omissions." *Id.* (citations omitted). While Black & Decker's compliance with an industry standard is relevant, and could be persuasive to a jury, it is not dispositive and does not compel summary judgment. *See, e.g.*, *Bourgeois v. Snow Time, Inc.*, — A.3d —, 2020 WL 7237271, at *15 (Pa. Dec. 9, 2020). Unlike the existence of a duty (which is a question of law), the issue of whether a duty

is breached is a question "properly reserved for a fact-finder." *Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214, 238 (Pa. 2018).

Here, the Court finds there is a genuine dispute of material fact on whether Black & Decker acted unreasonably and breached its duty of care. For example, Mr. Whyte can present evidence showing that Black & Decker was aware that its hammer could "mushroom," and that users of the hammer shouldn't use a "mushrooming" hammer because it could cause the hammer to chip or crack. Similarly, Mr. Whyte can present evidence that Black & Decker was aware that striking the hammer against a hardened surface could cause the hammer to chip and injure the user (as it did Mr. Whyte). Indeed, Black & Decker's corporate designee testified that Black & Decker knew of these various risks that using the hammer could pose. *See* ECF 37-9, p. 12 (testifying that the hammer is designed, qualified, and manufactured in compliance with the ASME standard). Each time the ASME standard changed, Black & Decker re-evaluated the hammer accordingly. *Id.* at p. 13. Thus, when the ASME standard noted the risks of using a mushrooming hammer, or using the hammer against a hardened surface (ECF 37-10, p. 22), Black & Decker was aware of it. Yet, as Mr. Whyte can show at trial, Black & Decker—despite this knowledge—did not mention these risks on the hammer's warning label. ECF 37-10, p. 17, Fig. 9; ECF 37-14, p. 10. This evidence, weighed in Mr. Whyte's favor, implicates a host of material, disputed facts a jury must consider (including the credibility and persuasiveness of Black & Decker's representative(s) who must explain the company's actions in light of its knowledge), in deciding whether Black & Decker breached its duty of care. Summary judgment is thus improper.

Black & Decker fails to show otherwise. Instead, it emphasizes that its hammer complied with the ASME warning-label standard. ECF 36, pp. 26-28. But that is not dispositive. Rather, compliance with an industry standard is one consideration the jury may assess, along with the rest of the evidence. *See, e.g.*,

*Bourgeois*, 2020 WL 7237271, at *15 ("Compliance with the statute or regulation is admissible as evidence of the actor's exercise of due care, but such compliance does not prevent a finding of negligence where a reasonable person would take additional precautions." (cleaned up)); *Neville Chem. Co. v. Union Carbid Corp.*, 422 F.2d 1205, 1216 (3d Cir. 1970) ("Evidence of the customary practice within the industry although admissible is not essential to a finding of negligence. Indeed . . . evidence of what usually is done is not necessarily what ought to be done, and is therefore not necessary to prove negligence."). Put simply, Black & Decker's "duty was not to comply with industry standards; its duty was to exercise reasonable care[.]" *Bourgeois*, 2020 WL 7237271, at *15; *see also Jones v. LA Fitness Intern.*, No. 11-632, 2013 WL 3789807, at *8 (E.D. Pa. July 22, 2013) ("While evidence of a defendant's compliance with applicable industry standards may be relevant and admissible for purposes of determining whether a defendant breached a duty of care, the duty of care is an objective standard determined by what an ordinary, careful and prudent person would have done under the same or similar circumstances." (cleaned up)). Thus, Black & Decker's compliance with the ASME warning-label standard does not compel summary judgment.[12]

Accordingly, the Court will deny summary judgment on Count II.

## C. The Court will deny summary judgment on Mr. Whyte's implied-warranty claim (Count III).

The Court will also deny Black & Decker's motion for summary judgment on Mr. Whyte's implied-warranty claim.

Pennsylvania implies a warranty of merchantability in a contract for the sale of goods if the seller is a merchant with respect to goods of that kind. 13 Pa. Cons.

---

[12] Similarly, because the dispositive determination is whether Black & Decker acted reasonably, Black & Decker's argument that it was not previously aware of any user of the hammer being injured, other than in their eyes, does not compel summary

Stat. § 2314(a).  This implied warranty requires that the goods be "fit for the ordinary purposes for which such goods are used."  *Id.* at § 2314(b)(3).[13]  In other words, the goods must "be of reasonable quality within expected variations and for the ordinary purpose for which they are used."  *Gall by Gall v. Allegheny Cty. Health Dep't*, 555 A.2d 786, 789-90 (Pa. 1989) (citations omitted).  "The elements that prove a breach of the implied warranty of merchantability are essentially the same as those to recover on a strict products liability claim."  *Reese v. Ford Motor Co.*, 499 F. App'x 163, 166 (3d Cir. 2012) (citation omitted).

The ultimate question here is whether Black & Decker's hammer is "***fit*** for the ***ordinary purposes*** for which [it is] used."  13 Pa. Cons. Stat. § 2314(b)(3) (emphasis added).  "[T]he word 'ordinary' is readily understood to mean 'common' or 'average.'"  *Phillips v. Cricket Lighters*, 883 A.2d 439, 444 (Pa. 2005) (citation omitted).  Whether the hammer is "fit" for its "ordinary purpose" is a fact-intensive question for the jury.  *See, e.g.*, *Steffy v. Home Depot, Inc.*, No. 06–2227, 2009 WL 4279878, at *12 (M.D. Pa. June 15, 2009) ("Plaintiffs' arguments, such as reference to the plywood's appearance, seem best presented to the jury to consider in its determination of whether this product has been used for its ordinary purposes.").

The Court finds, as with the strict-liability claim, which is similar to the implied-warranty claim, that there are genuine disputes of material fact as to what the hammer's "ordinary purpose" is, and whether the hammer was "fit" for such purpose.  As Black & Decker asserts, the ASME standard instructs not to use the hammer against a hardened surface.  *E.g.*, ECF 37-10, p. 22.  Yet the ASME standard

---

judgment.  Rather, Black & Decker's prior knowledge is simply one consideration the jury may assess in deciding whether Black & Decker acted unreasonably.

[13] Section 2314(b) provides several other implied warranties.  But Mr. Whyte's implied-warranty claim is specifically based on the implied warranty concerning the hammer's ordinary purpose.  ECF 40, p. 26.

is not dispositive, and the record reflects that it may have been common practice to use the hammer against hardened surfaces. *See Phillips*, 883 A.2d at 444 ("[T]he word 'ordinary' [purpose] is readily understood to mean 'common' or 'average.'") (citation omitted). That is, while it's undisputed that Mr. Whyte used the hammer against a harder surface (ECF 37-10, p. 9; ECF 37-13, p. 32), there is also evidence that his use was a common use of the hammer at his place of employment. *See* ECF 37-1, pp. 34-36 (Mr. Whyte testifying that he was trained to use the hammer against the harder stamper, and that this was the "team" process and was "just the way it was done"). Thus, there remains genuine disputes of material fact as to the hammer's ordinary purpose.

Moreover, like the strict-liability claim, the implied-warranty claim here turns on the sufficiency of the hammer's warning. *See Reese*, 499 F. App'x at 166. Mr. Whyte's use of the hammer against the harder stamper led to his injury. *E.g.*, ECF 37-10, p. 10; ECF 37-13, pp. 31-32. But as discussed above, the hammer's warning label said nothing about using the hammer against harder surfaces. The jury will have to weigh the competing evidence as to the sufficiency of this warning to determine whether Black & Decker breached the implied warranty.

Thus, drawing all reasonable inferences in Mr. Whyte's favor, the Court finds that summary judgment is not warranted.[14]   There are genuine disputes as to

---

[14] Black & Decker's arguments to the contrary fall short. Black & Decker asserts that (1) the hammer was fit because it complied with the ASME warning-label standard, and (2) Mr. Whyte did not use the hammer for its ordinary purpose because he used it in a manner non-compliant with the ASME standard. ECF 36, pp. 29-30. Essentially, Black & Decker's arguments rely on the ASME standard being dispositive, *i.e.*, compliance with the ASME warning-label standard renders the hammer fit, and the ASME standard defines the ordinary purpose of the hammer. But Black & Decker provides no legal authority for this position. Further, Black & Decker's arguments confuse the analysis. The question is not whether the hammer complied with industry/commercial standards; rather, it's whether the hammer is *fit* for its *ordinary* purposes. The ASME standard may be relevant on this question, but it is not dispositive. *Cf. Maneri v. Starbucks Corp. Store #1527*, No. 17-3881, 2019

whether Mr. Whyte used the hammer within its "ordinary purpose."  And because the hammer did not warn of the risk of using the hammer in this manner—such use leading to Mr. Whyte's injury—the jury must also determine whether the hammer was "fit" for such purpose, weighing similar considerations as with the related strict-liability claim.  The Court will therefore deny summary judgment on Count III.

### D. The Court will grant summary judgment on Mr. Whyte's express-warranty claim (Count IV).

For the reasons discussed below, the Court will grant Black & Decker's motion for summary judgment on Mr. Whyte's express-warranty claim, and accordingly dismiss the claim.

An express warranty arises when the seller makes "(1) [an] affirmation of fact or promise . . . to the buyer which relates to the goods and becomes part of the basis of the bargain . . . ; [or] (2) [a] description of the goods which is made part of the basis of the bargain[.]"  13 Pa. Cons. Stat. § 2313(a)(1)-(2).  Therefore, "to create an express warranty, the seller must expressly communicate the terms of the warranty to the buyer in such a manner that the buyer understands those terms and accepts them." *Goodman v. PPG Indus., Inc.*, 849 A.2d 1239, 1243 (Pa. Super. Ct. 2004).  To show that the seller made an express promise that became part of the basis of the bargain, the plaintiff must "prove that she read, heard, saw or knew the advertisement containing the affirmation of facts or promise," which then "induce[d the] purchase[] of the product."  *Gross v. Stryker Corp.*, 858 F. Supp. 2d 466, 501 (W.D. Pa. 2012) (Fischer, J.) (citations omitted).  "Absent a demonstration that a promise or affirmative statement was made, how or by whom the promise was made, or what

---

WL 5626650, at *10 (E.D. Pa. Oct. 31, 2019) ("[T]he implied warranty of merchantability and the rule of strict liability . . . are essentially the same." (citing *Gumbs v. Int'l Harvester Inc.*, 718 F.2d 88, 94 (3d Cir. 1983))).

was in fact promised, a claim for breach of express warranty" fails.  *Id.* at 501-02 (citation omitted).

Here, Black & Decker asserts that there is no evidence in the record showing that it made any express warranty to Mr. Whyte or Mr. Whyte's employer.  And Mr. Whyte fails to point to any evidence in the record demonstrating otherwise.  Instead, Mr. Whyte simply states—without any citations to the record—that: (1) Black & Decker should "appreciate" that its tools are sold "extensively for home and commercial use"; (2) the hammer "was advertised on [Black & Decker's] website to be 'ideal for striking chisels and punches or riveting, shaping and bending metal'"; (3) Mr. Whyte understood that the hammer was the correct tool to use for his job; and (4) Black & Decker, but not Mr. Whyte, was aware of the risk of severe injuries that could result.  ECF 40, pp. 30-31.  But even putting aside that Mr. Whyte provides no citations to the record, his arguments fail to show any evidence supporting the essential elements of his claim.

Initially, Mr. Whyte fails to show that Black & Decker made any promise or affirmation to him that could comprise an express warranty.  While Mr. Whyte asserts that Black & Decker posted an advertisement on its website, there is no evidence that Mr. Whyte saw it.  Indeed, there is no evidence that Black & Decker made *any* statement to Mr. Whyte before his injury, much less evidence of the details surrounding any purported statement.  Likewise, there's no evidence that Mr. Whyte entered into an agreement or transaction with Black & Decker, so even assuming Black & Decker directly or indirectly made a promise to Mr. Whyte, there's no evidence it formed part of the basis of a bargain.  Mr. Whyte thus presents no evidence showing an express warranty between Black & Decker and him.

Mr. Whyte also fails to establish that Black & Decker created an express warranty with Mr. Whyte's employer that could be extended to Mr. Whyte.  Initially, the same evidentiary flaws that preclude finding an express warranty between Black

& Decker and Mr. Whyte also preclude finding an express warranty between Black & Decker and Mr. Whyte's employer.  Further, even if there was evidence that an express warranty exists between Black & Decker and Mr. Whyte's employer, there is no evidence that it extends to Mr. Whyte.

Express warranties can be extended to third parties when: "(1) the party issuing the warranty intends to extend the specific terms of the warranty to the third party (either directly, or through an intermediary); and (2) the third party is aware of the specific terms of the warranty, and the identity of the party issuing the warranty." *Goodman*, 849 A.2d at 1246.  But as highlighted above, Mr. Whyte does not point to any evidence that supports such a finding.

Put simply, Mr. Whyte fails to present sufficient evidence establishing an express warranty, and he shows no genuine dispute of material fact that would preclude summary judgment.  *See Celotex*, 477 U.S. at 322.  Accordingly, the Court will grant summary judgment to Black & Decker on Mr. Whyte's express-warranty claim.  Count IV will be dismissed with prejudice.

## CONCLUSION

For the reasons discussed above, the Court will grant Black & Decker's motion to exclude, deny Black & Decker's motion for summary judgment on Counts I-III, and grant Black & Decker's motion for summary judgment on Count IV.  An appropriate order follows.

DATED: January 22, 2021                    BY THE COURT:

                                           /s/ *J. Nicholas Ranjan*
                                           United States District Judge